GARY M. RESTAINO
United States Attorney
District of Arizona
Gordon E. Davenport, III
Assistant U.S. Attorney
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: gordon.davenport.iii@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>   vs.<br><br>Carlos Victor Passapera Pinott,<br><br>              Defendant. | CR20-01706-TUC-JGZ (MSA)<br><br>**Government Response to PSR Objections** |

The government lodges the following in response to the defendant's objections to the Presentence Report prepared by the United States Probation Office.

**Objection 1:**

**Page 1-2 Forfeiture**

The property located at 6994 Leo Ln. was removed from the plea agreement by agreement. The government continues to assert the $1,096,000 calculation is proper.

**Objection 2:**

**Page 3 "La Migra"**

La Migra is a phonetic slang for "Border Patrol" derived from the proper term, "La Inmigration." (See https://www.spanishdict.com/translate/la%20migra, among many many others). Effectively like referring to police as "po-po." The objection does not make

clear why the ex-border patrol agent objects to the idea that other individuals referred to him as effectively the Border Patrol agent. Additionally, he is referred to by others within the confines of this crime both directly and indirectly as Migra (See Bates 9687, Saved into another's phone as "Carlos Migra").

**Objection 3:**
**Page 3 Alternate DOB**

The government agrees with Probation. Even if included in error, it is a DOB that is attributable to the defendant and properly included.

**Objection 4:**
**Page 4 Offense Conduct**

As noted, this is moot as the PSR correctly notes what the defendant pled to in Part A, Paragraph 3.

**Objection 5:**
**Firearm**

Given the scope and frequency of smuggling that the defendant engaged in while on duty as a Border Patrol Agent, often fully dressed in a Border Patrol uniform and often while utilizing United States Border Patrol vehicles to facilitate his conduct, it follows naturally that he was in possession of the standard equipment (including a firearm) for a USBP Agent in the field. Given the contours of this case, the default assumption is that the defendant was properly equipped as a border patrol agent at the time of his criminality.

Defendant's argument for his objection must be that he specifically disarmed himself when picking up drugs alone in remote locations and transporting them further into the United States with his service weapons somewhere else. There is absolutely nothing in the record or provided for by the defendant that indicates the defendant would take that step.

Note 1: On the day in question, the defendant was driving his Ford Explorer. Surveillance had previously seen him drive his red Mini-Cooper to meet the same person at the Airport in May. (See e.g. Bates 28 -30, regarding May 14, 2020). Of note, that Mini-Cooper was found to have a duffle bag with six magazines and significant amount of training ammunition in its trunk when the house was searched.

Note 2: The picture of the defendant from the burner phone that he says was not his until just before his arrest has a selfie type picture on it that seems to show a full allotment of border patrol gear, but the picture does stop just above the waist, so there is no definitive photographic proof of the service weapon. (See Production 1, Phone Analysis).

**Objection 6**

**Page 5: Drug Trafficking**

Production 1, Bates 71 is the section of the report from Detective Freiwald that contains the observations of the hand-off of Narcotics between Mary Gallardo-Davila and the defendant. The summary of the event is clear:

> At approximately 0924 Hours, I observed Mary's Nissan Sentra travel westbound through the parking garage travel lanes towards the White Explorer. As she pulled even with the White Explorer in the travel she stopped in front of his vehicle. Carlos exited the Explorer and they greeted each other. Carlos verbally and hand signaled to Mary to back her vehicle into spot east of him. Mary backed her vehicle two spot east of Carlos and two spots west of me. As Mary was backing her vehicle upon Carlos went to the rear of his White Ford Explorer and unlocked opened the rear hatch of the SUV. He then retrieved a new large black duffle bag that he slung onto his shoulder and walked to the rear of Mary's Vehicle. Carlos waited for Mary to remotely unlock the trunk. Once the trunk was unlocked and opened partially, Carlos fully opened the trunk and placed the black duffle bag inside the trunk compartment of the Nissan Sentra. At that time Mary exited her vehicle and met Carlos near the trunk area. They appeared to be having a verbal conversation while Carlos was placing the duffel bag into the Sentra. Carlos went back to his Ford Explorer and retrieved another newer black duffle bag slung it onto his shoulder and walked back over to Mary's Sentra and placed the second black duffle bag in the trunk compartment. Carlos then closed the trunk lid of the Nissan Sentra. While he was closing the trunk lid he was still speaking with Mary verbally. Mary removed a small object which appeared to be a large business envelope or similar object and gave it to Carlos. As they separated their ways. Carlos and Mary concluded their conversation and started to walk away from each other. Mary got back inside her Nissan Sentra and travelled away westbound and then southbound through the parking garage out to the exit. Surveillance units then picked her up as she exited the garage. Special Agent Maxwell notified us by radio we were going to leave Carlos be and focus all attention onto Mary and attempt to stop her away from the airport. Carlos returned to his vehicle closed the rear hatch and got back into his vehicle. After two minutes of not moving I exited my surveillance position and joined the surveillance units following Mary and the Nissan Sentra.

Mary Gallardo-Davila was stopped approximately 20 minutes later with the narcotics (still inside the duffle bags) in the trunk of her car. At the time of the arrest the government was receiving Geolocation date based on the defendant's cell phone and the burner phone were active during this period, (See Bates 986 to Bates 999), and it was the Government's intention to simply show the location data at the border if this went to trial. (The data acquired, was disclosed via blue Ray on Bates 926.)

The only inference not covered by the evidence, is the possibility that the defendant had the narcotics in the trunk at his home, traveled several hours for an unrelated reason, went to the border, stopped, and then returned to the Phoenix airport to exchange them with Ms. Gallardo-Davila. It is the government's position that this is not meaningfully better story for the defendant.

**Objection 7:**

**Page 5 Drug Type and Amount**

The government would recommend relying on the Maricopa County Sheriff's Report located at Bates 10059 to 10064. That is the first-person account that outlines the testing procedure and the counting procedure from the seizures. From that report, the narcotics seized that day constituted:

399,312 (appx) M-30 fentanyl pills

21 kilos cocaine

1 kilo heroin

1 kilo Fentanyl

 

The government does acknowledge that we are having to estimate based on weight from a sample size ration of 110g/1000 pills.

The Government recommends using the MCSO report as definitive. First, because it the written first-person account that other later reports reference, and 2) is attended by photos on each of the steps for weighing and searching. See Bates 10078 through 10134. Several other reports (specifically Bates 85 and Bates 2926) contain a transcription error that switches a 7.7lb bag of pills from one of the duffle bags to the other.

**Objection 8**
**Page 5 Gallardo Davila**

As noted above "Migra" is a slang term for a Border Patrol agent. There does not seem to be a disagreement on the amount of drugs and cash in Gallardo-Davila's home. The government considered her credible. There are other aspects of her statement that are corroborative. Such as:

- The visual similarity to the pills seized from the house and the car
- Prior surveillance which corroborated a prior airport meeting in May. See Bates 28.

- •       The identification of the Car Wash as place for exchanges. Bates 55.
- •       The bundling of the pills in 1000-unit baggies.

The government's position is that that information and the information in 9 is sufficiently reliable to be included in the PSR report. Defendant's position seems to beggar belief. On the day in question, the defendant's current claim is he exchanged over a 120lbs of hard narcotics for the first time and without any prior experience working with the person who we know received the drugs? Unlikely.

**Objection 9 and 10:**

**Page 5–6 Drug Trafficking**

    Double Hearsay is an admissibility issue for trial. This is not trial. The government believes that this is included for context and trusts the Court to give it appropriate weight.

**Objection 12 – 19:**

**Page 6-8 Objections, Burner Phones**

    At the crux of the of the defense objections 12- 19, is the claim that the burner/ pre-paid phones at the defendant's house were not used by the defendant until August of 2020 and that he did not smuggle aliens. This is a series of falsehoods and these sections of the PSR report should remain unchanged.

    Ideally, to prove that the defendant's statement is a false, the government would want to cite to conversations from the phone in question, prior to August 2020, that shows that are traceable back to the defendant. Therefore, the government cites the probation report writer to "MOA 9.04.2020 Other Review of Cellular Extraction . . . " and the "MOA 9.08.20 Other Review of Cellular Contacts Unknown Contacts 1" located in Production 1 where between February 2020 and May of 2020 the person using the phone discusses transportation of an illegal alien in exchange for a gold necklace.. The government would then cite the probation officer to two reports in Production 10, 058F-PX-3206464_0000233 and 058F-PX-3206464_0000014, which memorialized the interview of the person that the

defendant smuggled for a gold necklace. That person and the person who met them on the north side after the BPA smuggled them both identified the defendant as the BPA they dealt with from a six-pack.

If the Court accepts the phone found in the defendant's house was used by the defendant in his smuggling endeavors, then these objections are largely gutted as the claim that he did not use that phone is worthless. There are a host of other indicia that the phone user was the defendant, but ultimately the entire question of Alien Smuggling is non-relevant to the guidelines.

**Objection 20 and 21**

**Paragraph 21 and 22.**

The government agrees with the USPO in this case. The defendant may disagree with the content or claim they are not credible, but ultimately the PSR accurately reflects their statement.

Respectfully submitted this 10th day of January 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Gordon E. Davenport, III*
Gordon E. Davenport, III
Assistant U.S. Attorney

Copy of the foregoing served
electronically this 10th day of January, 2024, to:

All attorneys of record